[Cite as *State v. Dukes*, 2026-Ohio-2028.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 2025CA00074 |
|    Plaintiff - Appellee | <u>Opinion & Judgment Entry</u> |
| -vs- | Appeal from the Court of Common Pleas of Stark County, Case No. 2025CR0724 |
| CARREYON A. DUKES, | Judgment:  Affirmed |
|    Defendant - Appellant | Date of Judgment:  May 28, 2026 |

BEFORE: Craig R. Baldwin, Robert G. Montgomery, and David M. Gormley, Judges

APPEARANCES: Kyle L. Stone (Stark County Prosecuting Attorney) & Christopher A. Piekarski (Assistant Prosecuting Attorney), Canton, Ohio, for Plaintiff-Appellee; George Urban, Canton, Ohio, for Defendant-Appellant.

*Gormley, J.*

{¶1} Appellant Carreyon Dukes challenges his conviction on a felonious-assault charge. According to Dukes, the State's evidence at trial was both unpersuasive and legally insufficient on the "serious physical harm" element of the crime. Also, the trial judge erred, Dukes contends, by limiting the presentation of some medical evidence during the trial. Dukes argues, too, that the guilty verdict in his case was inconsistent with the same jury's verdict in a co-defendant's case, and so the trial court, he says, should have granted a motion from Dukes seeking a new trial. After considering each of these arguments in turn, we see no reason to overturn the conviction. The trial court's judgment is affirmed.

**The Key Facts**

{¶2} In March 2025, Dukes and two co-defendants — Jordan Worthey-Sturdivant and Demonte Williams — were inmates at the Indian River Juvenile

Correctional Facility in Massillon, Ohio. (Dukes was 19 years old at the time.) Video-surveillance footage recorded at the correctional facility on the evening of the incident in question shows a group of inmates relaxing in a recreational room when — without any apparent provocation — Dukes approaches 17-year-old inmate A.M., puts him in a chokehold, and throws him to the ground. Williams and Sturdivant then joined Dukes in hitting and kicking A.M. for roughly one minute.

{¶3} Soon after that initial pummeling ended, one of the correctional facility's staff members entered the room, as did another one several minutes later. The 17-year-old inmate who had been struck by Dukes and the two others with him sat alone on the floor while the two staff persons were in the room. Once those two staffers departed, the four inmates were again left unsupervised in the recreational room. Dukes and the two inmates who had participated with him in striking A.M. then delivered additional blows to the 17-year-old victim, with the final one coming when Sturdivant — assisted by Dukes — lifted A.M. and then threw him headfirst onto the floor. The entire episode was recorded by a video-surveillance camera in the room.

{¶4} After A.M. landed headfirst on the floor, the video footage shows him lying motionless there on his stomach until inmate Williams approached and rolled A.M. onto his back. Dukes and another inmate who had entered the room then poured some water onto A.M.'s face, and A.M., while still on the floor, moved to a seated position and leaned against a chair. Inmate Williams used a shirt to wipe some blood from the back of A.M.'s head while A.M. remained slumped against the chair for several minutes.

{¶5} Hours later, A.M. reported the attack to some staff members at the correctional facility. Because A.M. claimed that he had sustained injuries, he was seen by

a nurse at the facility, and that person provided Tylenol to him. A.M. was then taken to a hospital for further evaluation.

{¶6} A trooper from the Ohio State Highway Patrol investigated the incident, and — several days after it occurred — the trooper spoke with A.M. about it. During that discussion, the trooper saw a laceration on the back of A.M.'s head.

{¶7} All three co-defendants were indicted on a charge of felonious assault. After a joint jury trial for all three of them, Dukes and Sturdivant were found guilty on the charge of felonious assault, while Williams was found guilty on a lesser-included misdemeanor charge of assault.

{¶8} Once the verdicts had been announced, and once the jurors had been polled, counsel for Sturdivant requested either a judgment notwithstanding the verdict or a new trial based on what he characterized as inconsistent verdicts. The trial judge verbally denied the motion, noting that the jurors' questions during deliberations showed that they viewed the defendants' actions separately.

{¶9} After the trial court had denied Sturdivant's motion, Dukes's counsel said that he joined in that motion and wanted the same relief that Sturdivant's counsel had requested. A few days later, counsel for Dukes and Sturdivant filed a joint motion seeking a new trial or a modification of the verdicts. The trial court denied that motion and ordered Dukes to serve a prison term. Dukes appeals.

**Dukes's Conviction Was Supported by Sufficient Evidence**

{¶10} We turn first to Dukes's argument that the State failed to present sufficient evidence to support his conviction on the felonious-assault charge.

{¶11} "When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if

believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "'The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Howell*, 2020-Ohio-174, ¶ 28 (5th Dist.), quoting *Jenks* at paragraph two of the syllabus. A "verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶12} To prove the R.C. 2903.11(A)(1) charge of felonious assault, the State was required to introduce evidence that Dukes knowingly "[c]ause[d] serious physical harm to another." The parts of Ohio's statutory definition of serious physical harm that arguably apply in this case are R.C. 2901.01(A)(5)(c) (physical harm that "involves some temporary, substantial incapacity") and R.C. 2901.01(A)(5)(e) (physical harm that "involves acute pain of such duration as to result in substantial suffering" or that "involves any degree of prolonged or intractable pain").

{¶13} The trooper who testified at the trial told jurors that he, during his investigation, had reviewed the notes from A.M.'s examination by the nurse at the correctional facility. In those notes, the nurse indicates that when A.M. was brought to the facility's clinic, he told the nurse that he had passed out. The nurse provided over-the-counter pain medicine to A.M., and staff from the correctional facility took A.M. to a hospital for further evaluation.

{¶14} At the hospital on the day after the incident, A.M. was seen by both a nurse and an emergency-medicine physician. The doctor's notes indicate that A.M. was

experiencing head, neck, and upper-back pain. A.M. also reported that he had been vomiting, which can be a symptom of head trauma, according to the doctor's trial testimony.

{¶15} The doctor saw a laceration on the back of A.M.'s head and noted that it was healing and needed no stitches. Computed-tomography or CT scans of A.M.'s head, neck, and upper back were taken, and both the doctor and a radiologist colleague concluded that the CT scans showed no injuries. The doctor testified, though, that a concussion or closed-head injury would not be apparent on a CT scan.

{¶16} The emergency-medicine doctor diagnosed A.M. with a closed-head injury, which, he told jurors, is an injury or trauma to the head that does not penetrate through the skull. Based upon his observations and what A.M. relayed to him, the doctor concluded at the time (and told jurors at the trial) that A.M.'s head injury could be classified as a concussion, although he acknowledged that he did not include a diagnosis of concussion in his "after-visit summary." The doctor testified that the listed diagnoses in that kind of document are often "complaint based," but he did provide concussion precautions to A.M. at the conclusion of A.M.'s hospital visit.

{¶17} "Multiple courts have held that loss of consciousness, irrespective of its duration, satisfies the requirements for a temporary, substantial incapacity as set forth in the statute." *State v. Loy*, 2025-Ohio-5175, ¶ 17 (3d Dist.). *See also State v. Redwine*, 2007-Ohio-6413, ¶ 32 (12th Dist.) ("Losing consciousness as a result of an assault constitutes serious physical harm"); *State v. Booker*, 2009-Ohio-1039, ¶ 16 (2d Dist.) ("Temporary unconsciousness constitutes a temporary substantial incapacity, and therefore serious physical harm"); and *State v. Sales*, 2011-Ohio-2505, ¶ 19 (9th Dist.)

("loss of consciousness, irrespective of its duration, satisfies th[e] definition" of "temporary, substantial incapacity").

{¶18} In addition, multiple appellate districts have found that a concussion constitutes serious physical harm. *State v. Battles*, 2021-Ohio-310, ¶ 14 (8th Dist.) (the State presented sufficient evidence to prove serious physical harm where the victim suffered a mild concussion, did not seek immediate medical attention, was able to leave the hospital within mere hours, and was given over-the-counter medication); *State v. Long*, 2014-Ohio-4416, ¶ 57 (11th Dist.) ("A concussion is a medical condition that would normally require hospitalization"); *State v. Davis*, 2002-Ohio-7068, ¶ 22 (8th Dist.) (sufficient evidence supported a felonious-assault conviction where the victim sought medical treatment for cuts, scrapes, and a concussion); *State v. Combs*, 2002 Ohio App. LEXIS 1141, *14 (5th Dist. Mar. 11, 2002) (sufficient evidence supported the element of serious physical harm where the victim suffered scarring, was knocked unconscious, and suffered a concussion). Even experiencing dizziness and falling as a result of being dropped and landing on one's head can constitute "temporary, substantial incapacity." *In re Reed*, 147 Ohio App.3d 182, 189 (8th Dist. 2002).

{¶19} "Serious physical harm" can also be inferred under R.C. 2901.01(A)(5) "'[w]here injuries are serious enough to cause [the victim] to seek medical treatment.'" *Sales*, 2011-Ohio-2505, at ¶ 19 (9th Dist.), quoting *State v. Lee*, 2008-Ohio-253, ¶ 30 (6th Dist.). *See also State v. Foster*, 2021-Ohio-1155, ¶ 36 (5th Dist.). And the "failure to seek immediate medical treatment does not preclude a finding of serious physical harm." *Booker*, 2009-Ohio-1039, at ¶ 51 (2d Dist.). *See also State v. Simpson*, 2019-Ohio-2912, ¶ 24 (8th Dist.) (finding sufficient evidence of serious physical harm where the victim,

who did not seek immediate medical attention, had sustained a minor concussion, a minor neck sprain, and a back contusion).

{¶20} Dukes and his two co-defendants conceded at trial that they had assaulted A.M., but each of them urged the jury to find that the State did not show that A.M. had suffered any serious physical harm. The jury heard enough, though, to sustain a guilty verdict on the felonious-assault charge against Dukes. Some evidence suggested that he suffered a concussion, some evidence pointed toward his having lost consciousness, and certainly the evidence indicated that A.M. was treated for head, neck, and back pain. And the jury saw a video, too, showing A.M. lying motionless after the second set of blows were inflicted on him, and that lack of movement appears to have prompted Dukes to toss water on A.M.'s face. Any of that evidence, when construed most strongly in the State's favor, could have provided jurors with a sound basis for finding that A.M. suffered serious physical harm as that term is defined in the Revised Code. On these facts, Dukes's sufficiency-of-the-evidence claim falls short.

**<u>Dukes's Conviction Was Not Against the Manifest Weight of the Evidence</u>**

{¶21} Dukes also argues that his conviction runs counter to the manifest weight of the evidence.

{¶22} In determining whether a conviction was against the manifest weight of the evidence, an appellate court acts "as a 'thirteenth juror,' and after 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be [reversed] and a new trial ordered.'" *State v. Hane*, 2025-Ohio-120, ¶ 20 (5th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The reversal of a conviction

on manifest-weight grounds should occur only in "the 'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶23} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them.'" *Thompkins* at 387 (emphasis in original). "[A]n appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision." *State v. Sheppard*, 2025-Ohio-161, ¶ 66 (5th Dist.).

{¶24} Dukes again argues that the State did not show, beyond a reasonable doubt, that Dukes caused serious physical harm to A.M. The minor head laceration that A.M. suffered, together with some inconsistencies in the medical records and trial testimony as to whether A.M. lost consciousness or suffered a concussion, left the jury with a meager amount of persuasive evidence — Dukes argues — to sustain a conviction for felonious assault.

{¶25} As we addressed above, the State presented sufficient evidence to show that A.M. suffered serious physical harm from the attack. The weight to be given to that evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "While the [trier of fact] may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence." *State v. Wolters*, 2022-Ohio-538, ¶ 20 (5th Dist.). And the jury need

not believe all of a witness's testimony and may accept only portions of it as true. *State v. Johnson*, 2015-Ohio-3113, ¶ 61 (5th Dist.).

{¶26} After reviewing the full record, we cannot say that the jury lost its way in finding Dukes guilty of felonious assault.

## The Trial Judge Did Not Abuse His Discretion When He Sustained the State's Objection to a Question About Factitious Disorder

{¶27} Next, Dukes argues that the trial court abused its discretion by not allowing a physician, during his testimony at the trial, to answer a particular question posed by defense counsel about a mental-health condition known as factitious disorder.

{¶28} The admission or exclusion of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court abused its discretion. *State v. Beatty*, 2026-Ohio-751, ¶ 47 (5th Dist.).

{¶29} Before the trial attorneys presented their opening statements, the trial judge instructed the jurors that opening statements are not evidence but are instead what "each side believes the evidence is going to show." In his opening statement, Dukes's counsel told jurors that A.M. had a prior diagnosis of factitious disorder, which counsel described as a malady that leads a person to "feign[] or exaggerate[] what happened to them in order to gain attention."

{¶30} Then during the cross-examination of a physician (the same doctor who had examined A.M. at a hospital the day after the March 2025 correctional-facility incident) whom the State had called as a witness, counsel for co-defendant Sturdivant directed the doctor's attention to a July 2024 diagnosis of "factitious disorder" in A.M.'s medical records. Sturdivant's counsel then asked the doctor to explain that two-word phrase. The doctor hesitated, explaining that he was not familiar with a precise definition and

indicating that he would need to refer to the "DSM," which we assume was a shorthand way of referring to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

{¶31} As the doctor continued with his answer by noting that A.M.'s medical records indicated that the diagnosis for him had been made in July 2024 — eight months before the doctor's sole encounter with A.M. — the State objected to the question, citing what the State said was a lack of relevance as well as a lack of knowledge on the part of the witness about that months-earlier diagnosis by a different physician. The trial judge sustained the objection and directed Sturdivant's counsel to "go to another question . . . that the doctor can answer." Sturdivant's counsel posed no other questions to the doctor about factitious disorder, and the jury heard nothing further about it during the trial.

{¶32} Once all parties had finished questioning all witnesses, Dukes's counsel — outside the presence of the jury — noted on the record that he, like Sturdivant's counsel, had wanted to ask the doctor about the July 2024 diagnosis of factitious disorder on A.M.'s medical records, but he understood the judge's ruling on the State's objection to the question. The trial judge then stated that the doctor "doesn't know anything about it, so I couldn't let him testify to it."

{¶33} Dukes now argues here that the State lost any right to object to witness questions about factitious disorder because the State failed to object when Dukes's counsel first mentioned the term in an opening statement. We are not persuaded. Nothing about defense counsel's mention of factitious disorder in the opening statement put the State on notice that defense counsel would attempt to elicit testimony about that issue from one of the State's witnesses. The doctor was not portrayed by the State as an expert on the disorder, he was not asked any questions about it on direct examination,

and he was not the physician who had evidently diagnosed A.M. with that disorder months before the scuffle at the correctional facility.

{¶34} As for the merits of the judge's ruling on the State's objection to the question about factitious disorder, we readily conclude that the trial judge did not abuse his discretion when the judge sustained the objection. According to Evidence Rule 602, a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The doctor to whom the question was posed professed no knowledge about the disorder, and he certainly was not in a position to speak knowledgably about some other doctor's conclusions from the year before. The judge's decision to sustain the State's objection appears to have been a sound one based on the witness's lack of personal knowledge about not only the disorder in general but also A.M.'s diagnosis in particular.

{¶35} And notably, the judge did not bar any of the three defendants from presenting their own witnesses about the disorder. The trial court's ruling was limited to one question posed to one doctor who was unfamiliar with A.M.'s mental health and who was not a mental-health expert. Other evidence could have been brought to the fore by Dukes's counsel or by the other lawyers, but nothing further was said about the issue for the balance of the trial.

{¶36} The trial court did not abuse its discretion by ruling as it did on the objection during the doctor's testimony.

## The Jury's Verdicts Were Not Inconsistent

{¶37} Turning to the verdicts, Dukes argues that the jury's determinations that he and Sturdivant caused serious physical harm and that Williams caused only physical harm were inconsistent.

**{¶38}** The jury was instructed on both felonious assault and the lesser-included offense of assault. The jury was also given verdict forms to complete for both felonious assault and assault for Dukes and for his two co-defendants. In the end, jurors found Dukes and Sturdivant guilty of felonious assault, while Williams was found guilty on the lesser-included assault charge.

**{¶39}** "There is no constitutional requirement that verdicts between co-defendants be consistent." *State v. Castleberry*, 2007-Ohio-5803, ¶ 17 (9th Dist.). *See also State v. Bryant*, 2013-Ohio-4446, ¶ 27 (5th Dist.) ("there is no requirement that judgments on the same count of an indictment be consistent as to codefendants" even "where two or more codefendants are tried together on the same charges and where one codefendant is convicted of a lesser included offense"). "[A] guilty verdict will stand 'so long [as] it is supported by sufficient evidence and is the product of a fair trial.'" *Castleberry* at ¶ 17, quoting *In re Herring*, 1996 Ohio App. LEXIS 3402, *9–10 (9th Dist. Aug. 14, 1996).

**{¶40}** "An inconsistent verdict may very well be a result of leniency and compromise by the jurors, rather than being caused by confusion." *State v. Fraley*, 2004-Ohio-4898, ¶ 15 (5th Dist.), citing *United States v. Powell*, 469 U.S. 57 (1984). "A jury need not deliver rationally consistent verdicts in order for the verdicts to be upheld." *State v. Tomic*, 2024-Ohio-5537, ¶ 47 (5th Dist.). The Supreme Court of Ohio has held that "the sanctity of the jury verdict should be preserved," and the trial judge should not upset the verdict by speculation or inquiry into matters to resolve the inconsistency. *State v. Lovejoy*, 79 Ohio St.3d 440, 444 (1997).

**{¶41}** Dukes contends that the jury evaluated the same injury, the same evidence, and the same fact pattern for each defendant and then returned incompatible conclusions.

He cites *State v. Huntley*, 30 Ohio App.3d 29 (1st Dist. 1986) to support his view on the issue. In *Huntley*, a defendant and a co-defendant had been tried together on a charge of aggravated burglary. The jury found the defendant guilty of burglary (finding that the apartment that had been entered was an occupied structure) and found the co-defendant guilty of breaking and entering (finding that the same apartment was an unoccupied structure). The court of appeals in *Huntley* held that the jury's findings — that the apartment was occupied as to one defendant but unoccupied as to the other defendant — were incompatible and therefore improper. *Id*. at 31.

{¶42} Our case is different because the co-defendants' actions were distinct and separable. Dukes and his co-defendants engaged in the correctional-facility fracas to varying degrees, and jurors were directed to determine each participant's conduct separately. In these circumstances, varying verdicts were entirely acceptable. *See State v. Price*, 2024-Ohio-3016, ¶ 25 (8th Dist.) (defendant's actions were not the same as his co-defendant's actions) and *Bryant*, 2013-Ohio-4446, at ¶ 29 (5th Dist.) ("While the substantive evidence presented on the counts was identical, the issues presented and developed varied in scope and degree as to each defendant").

{¶43} Jurors had the opportunity to view the surveillance-camera footage that showed each of the co-defendants' actions in the attack on A.M., and jurors were free to find that Dukes was more culpable and had caused greater harm than had co-defendant Williams. *See State v. Young*, 2018-Ohio-3047, ¶ 24 (8th Dist.) (rejecting a manifest-weight challenge to divergent verdicts).

{¶44} We also agree with the trial judge's post-trial remark that the jurors' questions to the judge during deliberations showed that they viewed the defendants' actions separately. In one question, jurors asked, "Is aiding and abetting only for the

actual crime that percipitates (sic) the act?" In another, they inquired, "During the 2nd assault – if one did not aid in the actual assault, i.e. of flipping, is that aiding?" In response to both, the judge directed jurors to rely on the jury instructions.

{¶45} And we see on the video recording that Sturdivant's actions — assisted by Dukes — caused A.M. to flip in the air and land headfirst on the floor. Those two co-defendants ended up with felonious-assault convictions. Williams, who shifted the victim's position on the floor after the attack had ended and who used a shirt to wipe blood from the back of the victim's head, ended up with a misdemeanor assault conviction. We decline to overturn Dukes's conviction based on what he claims is an unfair and improper inconsistency.

## The Trial Judge Did Not Abuse His Discretion When He Denied Dukes's Criminal Rule 33 Motion for a New Trial

{¶46} Finally, Dukes argues that the trial judge should have modified the verdict in his case or should have granted his motion for a new trial.

{¶47} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: (1) Irregularity in the proceedings" that had the effect of "prevent[ing the defendant] from having a fair trial" . . . [or] (4) That the verdict is contrary to law." Crim.R. 33(A).

{¶48} A motion for a new trial under Criminal Rule 33 is addressed to the sound discretion of the trial court, and that court's decision will not be reversed absent an abuse of discretion. *State v. Williamson*, 2021-Ohio-4140, ¶ 30 (5th Dist.). An abuse of discretion is more than a mere error of law; "it implies that the court's attitude is unreasonable, arbitrary[,] or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶49}** After the verdicts were read aloud in court, the trial judge provided counsel with the opportunity to review the verdict forms. While reviewing the forms, counsel for Dukes asked: "They didn't go on to the other one at all?" And the trial judge responded: "No, these are the only ones they filled out." The jury was then polled at the request of Dukes's counsel, and each juror confirmed his or her verdicts.

**{¶50}** After the jury was polled, the trial judge asked counsel if anything else needed to be addressed before he released the jury. Counsel for Sturdivant and Williams responded no, while counsel for Dukes remained silent. Not until after the jury was released did counsel for Sturdivant verbally move the trial court for judgment notwithstanding the verdict or for a new trial based on his claim of inconsistent verdicts due to the jury finding both serious physical harm and physical harm for what counsel described as "the exact same event for a single injury." The trial judge denied the motion, noting that the jurors' questions to him during deliberations suggested that jurors perceived varying levels of culpability among the three co-defendants. After the trial judge denied the verbal motion, Dukes's counsel orally joined in the motion, although he indicated that he understood the ruling.

**{¶51}** Several days later, counsel for Sturdivant and Dukes filed their joint motion for a new trial or for modification of the verdicts. The motion alleged again that the verdicts were inconsistent. The judge promptly denied the motion.

**{¶52}** We agree with the trial judge's ruling for several reasons. First, no objections to the verdicts were raised by defense counsel before jurors were discharged. "A party may not sit in silence while the jury is discharged and then attack the verdict as defective." *Gary Moderalli Excavating, Inc. v. Trimat Constr., Inc.*, 2013-Ohio-1701, ¶

54 (5th Dist.) (finding that the appellant waived its objection to the jury's alleged omission by failing to object before the jury was discharged).

**{¶53}** Second, Dukes had no standing to attack the lesser verdict against co-defendant Williams. The guilty verdict form on the felonious-assault charge in Dukes's case was properly signed by all 12 jurors, and the poll of the jurors was consistent with that verdict form. The verdicts and verdict forms in his co-defendants' cases are not proper issues for Dukes to challenge in the trial court or here. *See Harris v. Rivera*, 454 U.S. 339, 348 (1981) ("[e]ven assuming that this acquittal was logically inconsistent with the conviction of respondent, respondent, who was found guilty beyond a reasonable doubt after a fair trial, has no constitutional ground to complain that [a co-defendant] was acquitted") and *Motorists Ins. Co. v. Sokol*, 1983 Ohio App. LEXIS 12943, *8 (8th Dist. Apr. 17, 1983) ("The unfortunate defendant who is held liable cannot complain about the favorable verdict rendered in favor of a fortunate codefendant").

**{¶54}** And in the end, as we explained above, the attackers' varying roles on the day of the incident could reasonably have led jurors to come to differing conclusions about the co-defendants' culpability. We see no abuse of discretion in the trial court's decision to deny Dukes's new-trial request.

**{¶55}** The judgment of the Court of Common Pleas of Stark County is affirmed. Costs are to be paid by Appellant Carreyon Dukes.

By: Gormley, J.;

Baldwin, P.J. and

Montgomery, J. concur.